## Williams v. Commonwealth.

(Decided May 13, 1913).

### Appeal from Fayette Circuit Court.

1. Criminal Law—Homicide—Evidence.—In a prosecution for homicide, evidence examined and held to sustain a verdict of death.

2. 'Criminal Law—Commonwealth's Attorney—Improper Argument.—
Though it is improper for the Commonwealth's Attorney to bring
to the attention of the jury or comment on the fact that there
were nine murder cases on the docket, yet where the statement
is objected to and the objection sustained, and the statement is
withdrawn from the consideration of the jury, and the trial in
other respects is fairly conducted, and it appears that no other
verdict could have been rendered, the case will not be reversed
on account of the improper argument.

P. J. SHERRY and WILLIAM E. NICHOLS for appellant.

JAMES GARNETT, Attorney General, and OVERTON S. HOGAN,
Assistant Attorney General, for appellee.

OPINION OF THE COURT BY WILLIAM ROGERS CLAY,
COMMISSIONER—Affirming.

On December 14, 1912, Jesse Williams shot and killed
Ike Fish. He was indicted and tried for murder. The
jury found him guilty of murder and fixed his punish-
ment at death. From the judgment of conviction he ap-
peals.

The facts developed on the trial are as follows:

Both appellant and Fish were negroes. Up to within
a few weeks of the homicide appellant had been living
with a negro woman by the name of Lennis Young. They
were not married. He and Lennis Young had some mis-
understanding and she left his house. After leaving
him she became the mistress of Ike Fish, and took up her
residence at the house of a woman by the name of Gate-
wood. Appellant went to this house to see Lennis Young
with reference to some receipts. While there he and Ike
Fish got into a difficulty and Fish threw a heavy lump
of coal at appellant, striking him on the head and ren-
dering him unconscious. At that time appellant did not
know Fish. On leaving the house he ascertained his name
and had Fish arrested. Fish was tried in the police court
of Lexington and sentenced to the work house. After be-
ing there a short time he was released.

At the time of the homicide Lennis Coung lived with
Maggie Baker on Dunnaway Street in Lexington. Fish
paid her board and lived there with her. The Baker
house is a cottage, consisting of two small rooms and a
kitchen. Lennis Young, a witness for the Commonwealth,
testified that on the afternoon of the homicide appellant
came to the house of Maggie Baker on Dunnaway Street.
At that time witness and Ike Fish were in the middle

room. Appellant came to the front door and knocked. At that time the door was not latched. It would not stay shut unless it was locked. Maggie Baker had just gone out and told witness not to latch the door as she was coming back. When appellant knocked on the door witness went to the door and said, "What do you want?" Appellant said: "I want to talk to you." Witness said: "No you don't, because you told me you had no use for me. You told me you didn't want me, and I don't want you, and so we have made an agreement that we don't want each other." She then told him to go ahead; that she didn't want anything to do with him. Appellant then told her that Maggie had said that he could come in and talk if he didn't make any fuss. At the same time he said: "Go on in. Heavens knows I don't' want no fuss. I have nothing to make a fuss with." At that time Ike Fish was in the other room. Witness told appellant that he could come on in if Maggie said he could come in. Appellant came in and sat beside the bed and twisted his handkerchief around. Addressing Ike Fish, he said, "You don't kere if I come in?" Ike said, "No, I don't care if you come in." Appellant sat down on the side of the bed and said: "That is the woman I love. Any time that she wants to she can come back to me. I will take her back." He was addressing Ike Fish at the time. Ike said: "I have nothing to do with it. It looks like to me if I had a girl and had ordered her out of doors and she would not come back, I would leave her alone." At that time appellant asked Ike Fish's permission to go out into the back yard. Ike bowed his head. Appellant then went into the back yard. In a short time he returned, buttoning up his trousers. Witness was in the kitchen fixing to sprinkle some clothes. Ike Fish was sitting in the middle room by the side of the table, with one hand on the back of his head and the other on the table. Witness never heard Ike Fish move at all. When appellant returned to the house, no remarks of any kind passed between him and Fish. As soon as he got into the house he began firing. When the shots were fired Ike Fish jumped up and ran to the middle door and appellant fired two more shots. At the time Fish had no weapon other than a small knife which was in his pocket. A man by the name of Tom Smith was in the house when the shooting took place. The shooting took place on Saturday, and the Tuesday before appellant had told her that he was going to kill Fish. Tom Smith, the other negro pres-

ent, testified that he had been in the house two or three minutes when the shooting took place. Prior to that time he did not know appellant. While he and Fish were seated, appellant asked permission to go into the back yard. Fish bowed his head. In a short time appellant returned. As he walked between witness and Fish, appellant began shooting. Fish was sitting down at the time. No words passed between appellant and Fish.

Maggie Baker testified that about ten minutes before the shooting took place she left her house for the purpose of going over to the house of a neighbor. When she left she told Lennis Young not to lock the door as she would be back in a minute. She saw appellant on the Saturday morning next preceding the homicide. Appellant asked if he could go to her house, as he wanted to talk to Lennis. Witness told him that he could not go to her house, as she did not want any trouble in her house. As she left her house on the afternoon of the homicide she saw appellant standing on the corner of Dunnaway and Pine Streets. Appellant was looking right at her. The place where he was standing is six or seven houses from her house. Appellant did not say anything to her. Someone informed her of the shooting and she returned home. She got there shortly before Fish died.

The coroner of Fayette County testified that Fish had been shot four times on the right side; that any one of the shots was sufficient to produce death.

The defendant testified that he was 33 years old. He had lived in Lexington since 1900. He had never been arrested before. He had been living with Lennis Young, but saw that she was going to get him in bad. On that account he put her out, and, giving her the few things she had, told her to stay out. He didn't want to be bothered with her in any shape or fashion. Afterwards she returned and asked for money. He told her he needed his money to pay his debts. After that he went up to the house where Lennis Young lived to get some receipts she had for his furniture. While in there, somebody hit him over the head with an iron poker twice. He fell on the floor and did not find out who had done it. He afterwards found out it was Ike Fish. Ike Fish was a big man—six feet tall, or taller. Witness was only five feet tall. After he had the trouble with Ike Fish he stayed out of the way. At that time Ike Fish was living with Maggie Baker. After Ike was released from the work house appellant never saw him until the day of the killing, nor did he

make any effort to find him. He was making an effort to keep away from him, as he was scared of him. He went to Maggie Baker's house because Maggie told him to go there. Maggie invited him to come up. When he went up there he didn't know that either Ike Fish or Lennis Young was there. When he got there he found Ike and Lennis. He didn't rap on the door as the door was not fastened. When he went in Ike was sitting in the middle room next to the fire. He didn't see Ike when he first went in; didn't know he was in there until he got in and sat down. When he saw Ike, Ike said "You come to see me?" Appellant said "No, sir, I come to see Maggie Baker." Ike then said "You son of bitch, you sent me to the work house." Appellant said "No, sir, I didn't send you to the work house." After that appellant went into the back yard and tried to get out over the back fence. He went out because he was afraid of Ike Fish. After he got out into the back yard he found there was a big, high fence all around, and there was no way for him to get out. He then came back into the house. Before he got to the door, someone said "Fasten the door." As he came into the house, both Ike and Tom Smith were standing up facing each other. He passed between them. Witness then corrected the above statement and said that Tom Smith was sitting down facing Ike Fish, while Ike was standing up by the side of the door. Ike had his hand in his left pocket. As he passed through the house he never stopped at all. His purpose was to get out of the house. When he got inside the middle door, Ike Fish "kinder broke at him," gritting his teeth. Neither of them said anything. Appellant then went on to the front door. When Fish made his break at appellant, Fish had his hand in his pocket, and appellant pulled his pistol. Appellant shot Fish with his left hand and at the same time was trying to unlock the front door with his right hand. Appellant further says that he never had any feeling or desire for revenge or anything of that sort against Ike Fish. He was just scared of him—that was all. He didn't want anything to do with Ike Fish at all. He bought his pistol from a boy down on the Kentucky River. He bought it about a week before the killing, and before he and Lennis Young split up. He was not in the habit of carrying a pistol, but was going out the railroad to his brother's in the country that night, and had the pistol in his pocket to protect himself from hobos. On cross-examination appellant denied seeing Maggie Baker

go down the street. He said that Ike Fish was in the middle room when he came in, and that he was so scared he was afraid Ike would get him if he tried to leave then. He went out into the back yard, although he had to pass by Ike Fish. He thought it was best to go out that way. The reason he didn't get out the back way was that the fence was over his head. The reason that he came back into the house was that he could not stay out in the back yard. He never intended to bother Ike until Ike made the break at him. It was Tom Smith who said "shut the front door," and a woman in the front room shut it.

A policeman testified that Ike Fish was a big, raw-boned negro, weighing perhaps 160 or 170 pounds, and five feet, eleven inches tall.

In rebuttal, Lennis Young testified that no one called "shut the door." She also testified that there was a side gate in the back yard, and that this gate was open all the time. The gate was on hinges and could be closed. Tom Smith also testified that he never said to anybody "Shut the door." He further testified, however, that he guessed the door was closed and locked.

For the appellant it is insisted that the verdict is not flagrantly against the evidence, but is manifestly the result of prejudice and passion on the part of the jury. In this connection it is insisted that the evidence shows that appellant had driven Lennis Young from his home, and had ceased to have anything to do with her, and that therefore the motive of jealousy is lacking. It is also insisted that appellant, after Fish struck him, had Fish arrested and let the law take its course, and that therefore the motive of revenge is wanting. It will be observed, however, that appellant bases his whole defense on the fact that he did not know Ike Fish was in Maggie Baker's house, and that he went there to see Maggie at her invitation. Being afraid of Ike Fish, he attempted to escape by going out in the back yard. Finding the fence too high to climb over, he returned to the house. Fish then gritted his teeth and started towards appellant, and believing that he was in danger, he fired at Fish. The evidence for the Commonwealth, however, shows that Maggie Baker had never invited him to the house, but on the contrary had told him not to come. Notwithstanding the fact that appellant claims that he did not know Ike Fish was in the house, he admits that he knew Fish lived there. While insisting that he went to the house to see Maggie Baker, the latter swears that

after she left the house she saw appellant on the corner and appellant saw her. Appellant's statement that when he got into the house he went into the back yard to escape, but that he could not do so on account of the height of the fence, is not borne out by the physical facts. He was in the front room while Ike Fish was in the middle room. Had he desired to escape he could have gone out the front door. Instead of doing this he passed right by Fish, though claiming to be afraid of him. When he got into the back yard he could have escaped through the gate, or, if necessary, over the fence. Instead of doing this he came back into the house and again passed by the man whom he claims he was trying to avoid. At the time, Fish had only a small penknife. Appellant claims that Fish started towards him with his hand in his left pocket. At that time appellant claims to have been at the front door, and that he shot Fish with his left hand while trying to unlock the door with his right. He does not claim that Fish made a single remark to him when he came back into the house. Even if we give full effect to appellant's own statement, it may be doubted if it shows that appellant believed and had reasonable grounds to believe that he was in danger of death or bodily harm at the hands of Fish, or that it was necessary, or appeared to appellant, in the exercise of reasonable judgment, to be necessary, to shoot Fish four times with a pistol in order to avert any real or, to the defendant, apparent danger at the hands of Fish. On the other hand the evidence for the Commonwealth shows that appellant and Lennis Young had lived together. She left him and took up with Fish. Appellant then went to see her and had a difficulty with Fish. Fish struck him a severe blow on the head. He had, therefore, two motives for the homicide; one of jealousy and one of revenge. A few days before the homicide appellant told Lennis Young he was going to kill Fish. When appellant went to the house on the day of the homicide, he protested that he did not go there to make a fuss, but he carried his pistol with him. According to the Commonwealth's witnesses, Fish never attempted in any way to attack or injure appellant, nor did he use offensive language in the presence of appellant. When appellant asked Fish's permission to go out into the back yard, Fish nodded his assent. Appellant went into the yard and was buttoning up his trousers as he returned. There was a closet in the yard. When he got back into

the house Fish was sitting down. Without a word being said by either of them he pulled his pistol and began firing. He shot Fish four times. Any one of the shots was sufficient to cause death. We cannot reverse a case merely because the jury believed the witnesses for the Commonwealth rather than the accused. If the witnesses for the Commonwealth are to be believed, appellant was guilty of a premeditated and unprovoked murder, and it is difficult to see how the jury could have reached any other conclusion. The mere fact that the jury imposed upon appellant the highest penalty prescribed by the law, or returned their verdict within five minutes after the case was submitted, cannot be regarded as evidence of prejudice or passion, when the verdict is fully warranted by the facts.

But it is insisted that the judgment should be reversed because of the improper argument of the Commonwealth's Attorney. The language complained of is as follows:

"At the beginning of this term of court there were nine murder cases on the docket. Now, gentlemen, this is a deplorable state of affairs, and it will never be stopped until we send some of them to the chair."

The record further shows that counsel for appellant objected to the foregoing statement, and the court sustained the objection and withdrew the statement from the consideration of the jury. While of course every man's innocence or guilt should be determined by the jury from the facts of the particular case, and no man should ever be convicted or made to suffer a severer punishment than the facts warrant, merely because of the prevalence of crime in the community, yet it has always been regarded as within the limits of legitimate argument to insist upon the jury doing its duty for the purpose of preventing bloodshed and crime. Meredith v. Commonwealth, 148 Ky., 106.

In this case the Commonwealth's Attorney went too far. It was not proper to bring to the attention of the jury or to comment on the fact that there were nine murder cases on the docket. But the record in this case shows no error in the admission or rejection of evidence. The instructions are in the usual form and are not subject to criticism. In every other respect, appellant had a fair and impartial trial. In view of the fact, therefore, that the court sustained an objection to the statement made by the Commonwealth's Attorney, and with-

drew it from the consideration of the jury, and in view of the uniform rule that a case will not be reversed on account of improper argument where the trial in other respects is fairly conducted and it appears that no other verdict could have been rendered, the judgment of conviction will not be disturbed. Truax v. Commonwealth, 149 Ky., 699.

Judgment affirmed.